UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| UNITED STATES OF AMERICA, Plaintiff, vs. DANIEL RAMOS, Defendant. | 5:17-CR-50010-JLV  REPORT AND RECOMMENDATION |
|---|---|

Pending is Defendant's Motion to Suppress Evidence (Doc. 15). An evidentiary hearing was held on May, 2, 2017. Defendant was personally present and represented by his attorney of record, Gregory J. Erlandson. The Government was represented by Megan Poppen. One witness testified at the hearing. Five exhibits were received into evidence. Both parties have submitted briefs and oral argument was heard at the conclusion of the hearing. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## RECOMMENDATION

It is respectfully recommended that Defendant's Motion to Suppress be denied.

## JURISDICTION

Defendant is charged in an Indictment with Sexual Abuse of Minor in violation of 18 U.S.C. §§ 1153, 2243(a), and 2246(2)(A). The pending Motion

1

was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Chief Judge Jeffrey L. Viken's Standing Order dated March 9, 2015.

## FACTUAL BACKGROUND

Law enforcement was investigating a sexual assault which occurred in September of 2016. Charlotte Boltz reported that she observed the Defendant Daniel Ramos, age 29, engage in a sexual act with a 15 year old female. During the course of the investigation, law enforcement received conflicting reports as to whether the sexual act was consensual or forced.

As part of his investigation, Special Agent Jeffrey Youngblood ("Agent Youngblood") made efforts to meet with Mr. Ramos. After a period of time, Agent Youngblood reached Mr. Ramos by telephone and advised that he wanted to meet. Mr. Ramos suggested that they meet in the parking lot of the Cherry Berry ice cream store on Haines Avenue, because it was close to where Mr. Ramos was living. (Doc. 36 at p. 7). A meeting was set for November 3, 2016, and Agent Youngblood described what his non-marked vehicle looked like. (Doc. 36 at p. 8).

On November 3, 2016, Agent Youngblood pulled into the Cherry Berry parking lot. He observed Mr. Ramos waiting in the parking lot. Mr. Ramos recognized the vehicle described by Agent Youngblood, approached and entered Agent Youngblood's vehicle. Agent Youngblood showed Mr. Ramos his Federal Bureau of Investigations ("FBI") credentials and asked Mr. Ramos if he knew what he was there to talk to him about; Mr. Ramos indicated that he knew. However, Agent Youngblood did not specifically identify the topic of the

interview or the nature of any possible charges. Agent Youngblood told him that he would like to record the interview and then began the tape recorder. (Doc. 36 at p. 9). Agent Youngblood informed Mr. Ramos as follows, "Before we get started, Daniel, I just need you to understand that you are not under arrest. Ok. I'm not going to arrest you during or after this conversation. The doors are unlocked. You're free to go anytime you want. You understand that?" (Exhibit 1). Mr. Ramos answered in the affirmative. Agent Youngblood did not give Mr. Ramos any <u>Miranda</u> warnings.

    Agent Youngblood had a weapon on him, but it was concealed under a shirt and not observable to Mr. Ramos. (Doc. 36 at p. 11)  During the conversation, Mr. Ramos revealed that he was encouraged by his girlfriend to talk the law enforcement and convey his side of the story. (Doc. 36 at p. 12). Agent Youngblood testified that there was not any point in the interview in which he believed that Mr. Ramos did not understand what he was saying. (Doc. 36 p. 12-13). In fact, at one point, Agent Youngblood asked Mr. Ramos what the word "integrity" meant and Mr. Ramos replied that it meant to be a man of his word. (Doc. 36 at p. 12). At the time of the interview, Mr. Ramos was 29 years old. (Exhibit 1). Although Agent Youngblood did not ask Mr. Ramos any questions to determine his level of education or whether he suffered any impairment (Doc. 36 at p. 25-26), he testified that he was able to determine that Mr. Ramos was competent and he received verbal confirmation from Mr. Ramos that he understood. (Doc. 31 p. 31; Exhibit 1). Agent Youngblood didn't see any impairment or reason to believe that Mr. Ramos

3

didn't understand. (Doc. 31 at p. 21). Agent Youngblood Agent Youngblood testified that Mr. Ramos' demeanor was of a person willing to be present with a positive demeanor. (Doc. 36 at p. 13). The tape recorded interview establishes that Mr. Ramos was articulate and gave appropriate answers to the questions being asked of him. (Exhibit 1). Mr. Ramos' demeanor was consistent throughout the interview and did not change after being informed that he would not be arrested before or after the conversation. (Doc. 36 at p. 13).

Mr. Ramos offered an exhibit into evidence that demonstrate that Mr. Ramos attended Pine Ridge High School for his 9th grade year and received poor grades. (Exhibit B). He also submitted medical records demonstrating that when he was 4 years old, Mr. Ramos wrecked his bike and received a laceration on his head requiring stiches; when he was 7, he was evaluated for ADHD and given a prescription for Ritalin; and when he was 19, he was assaulted and kicked in the head; when he was 20 he was taken to the ER with a forearm injury; when he was 21 he was taken to the ER after being hit with a metal bat and sustained a laceration to his scalp; when he was 23 he was hit in the ribs and kicked in the face; and when he was 29 he got in a fight and blacked out after his head was stomped on. (Exhibit D). No evidence was submitted showing whether Mr. Ramos suffered any long term effects as a result of these injuries.

During the ten minute interview with Agent Youngblood, Mr. Ramos gave a description of the sexual encounter. At the conclusion of the interview, Mr. Ramos exited Agent Youngblood's vehicle and left the area. Mr. Ramos was

arrested on February 10, 2017 (Doc. 5) by Agent Youngblood. Mr. Ramos seeks to suppress the statement made to Agent Youngblood during the November 3, 2016, interview.

## **DISCUSSION**

Mr. Ramos argues that his statement must be suppressed because he was in custody and not given Miranda warnings. In the alternative, Mr. Ramos argues that his statement must be suppressed because it was not voluntary, given Agent Youngblood's promise that Mr. Ramos would not be arrested during or after their conversation.

### I.     **Whether Mr. Ramos was in custody**

Mr. Ramos argues that his statements should be suppressed because he was not advised of his Miranda rights. The government alleges that Mr. Ramos was not in custody and was not entitled to advisement of Miranda rights. It is undisputed that Mr. Ramos was interrogated; the only issue is whether he was in custody.

An individual is entitled to an advisement of Miranda when that individual is "taken into custody for questioning." United States v. Axsom, 289 F.3d 496, 500 (8th. Cir. 2002) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Miranda requires that the individual be advised of "his right to be free from compulsory self-incrimination and his right to assistance of counsel." Id.

A suspect is in custody when he is "deprived of his freedom of action in any significant manner." Axsom, 289 F.3d at 500 (citing United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990)). A court considers the totality of

5

the circumstances in deciding whether "a reasonable person in the suspect's position would have understood his situation to be one of custody." United States v. Anaya, 715 F.Supp.2d 916, 928 (D.S.D. 2010). The determination of whether a subject is in custody considers both "the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation." Axsom, 289 F.3d at 500.

United States v. Griffin lists six non-exhaustive factors that are representative of whether an individual is in custody. "(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; (6) whether the suspect was placed under arrest at the termination of the questioning." 922 F.2d 1343, 1349 (8th Cir. 1990).

As to the first and sixth factors, Mr. Ramos was informed that questioning was voluntary and he was free to leave at any time. He was told that he was not under arrest. Mr. Ramos was not arrested *at the termination* of the questioning. As to the second factor pertaining to his freedom of movement, the interview only lasted about ten minutes; he was told the doors

6

were unlocked and he could leave at any time. Mr. Ramos never asked or made an attempt to go anywhere. As to the third factor, Mr. Ramos was aware that law enforcement was looking for him. When asked to meet with law enforcement, Mr. Ramos suggested the meeting place of the Cherry Berry parking lot, because it was close to his residence. The evidence establishes that Mr. Ramos voluntarily acquiesced to Agent Youngblood's request to meet and answer his questions. As to the fifth factor, Mr. Ramos was friendly and cooperative during questioning. Agent Youngblood did not have a firearm displayed during the interview and the interview took place in an unmarked car. The congenial tone of both Mr. Ramos and Agent Youngblood establishes that the atmosphere was not police dominated.

The attitude of an individual goes to showing whether that individual is voluntarily acquiescing to the requests to respond to questions. See, e.g., Axom, 289 F.3d at 501-502 (where defendant voluntarily acquiesced to requests by agents to answer questions as shown by his friendly and cooperative nature during the interview and offer to show agents which of his computers contained child pornography). The above five factors weigh heavily in favor of a finding that Mr. Ramos was not in custody.

The only factor remaining is whether there is evidence of strong arm tactics or deceptive stratagems used by the agent. Mr. Ramos argues that Agent Youngblood's assertion that he would not be arrested after the interview amounts to a deceptive stratagem which renders the interview a custodial interrogation. In the context of whether the use of deception renders what

7

would otherwise be a non-custodial setting into a custodial setting, the Eighth Circuit has held that "[e]ven where, for instance, a police officer's questions contain 'an implicit factual assertion' admittedly designed to elicit a confession, we determined that 'kind of deceit would not have acted to prevent a reasonable person from terminating the interview' and leave or ask the agents to leave. The use of deception is irrelevant unless it relates to a reasonable person's perception of his freedom to depart." United States v. Laurita, 821 F.3d 1020, 1023-24 (8th Cir. 2016) (internal citations omitted). Agent Youngblood's statement that Mr. Ramos would not be arrested after the interview does not suggest, in any way, that Mr. Ramos would be prevented from leaving or terminating the interview.

Considering the totality of the circumstances, a reasonable person in Mr. Ramos' shoes would not conclude that he was in custody. Therefore, he was not entitled to a recitation of his Miranda right to be free from compulsory self-incrimination and his right to an attorney.

## II.     Whether Mr. Ramos' statement was voluntary

Mr. Ramos argues that his statement should be suppressed because it was given involuntarily. Specifically, he argues that the unqualified promise that he would not be arrested after the interview renders the statement involuntary. The burden of demonstrating that a defendant's statement was voluntary rests with the government, which must prove voluntariness by at least a preponderance of the evidence. United States v. Lebrun, 363 F.3d 715, 724 (8th Cir. 2004).

8

Due process requires that confessions be voluntary. See Brown v. Mississippi, 297 U.S. 278, 285–86 (1936); see also Schneckloth v. Bustamonte, 412 U.S. 218, 225–26 (1973) (explaining that voluntary confession may be used against defendant while the use of involuntary confession offends due process). "The appropriate test for determining the voluntariness of a confession is 'whether ... pressures exerted upon the suspect have overborne his will.'" United States v. Meirovitz, 918 F.2d 1376, 1379 (8th Cir.1990) (quoting United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir.1989)).

Statements are involuntary if they are "extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." Lebrun, 363 F.3d at 724 (citing Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001)). "A statement is voluntary if it is the product of an essentially free and unconstrained choice by its maker." United States v. Anaya, 715 F.Supp.2d 916, 931 (8th Cir. 2010) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973)).

The voluntariness of a confession is judged by the totality of the circumstances. Anaya, 715 F.Supp.2d at 932. The "conduct of the officers and the characteristics of the accused" are both considered in this determination. Id. It is important to note that "[a] statement cannot be rendered involuntary by the incapacity of the defendant alone; there must be some coercive police activity." Id. (citing Colorado v. Connelly, 479 U.S. 157, 164, 167 (1986)). Furthermore, a defendant's mistaken belief that an offense cannot be

9

prosecuted or is not prosecutable does not make a confession involuntary. Lebrun, 363 F.3d at 725.

Mr. Ramos concedes that with the exception of the unqualified promise that he would not be arrested, law enforcement did not engage in threating or coercive behavior. (Doc. 36 at p. 36). Therefore, the court must determine the narrow issue of whether Agent Youngblood's statement, "I'm not going to arrest you during or after this conversation" constitutes an express or implied promise sufficient to overbear the defendant's will and critically impair his capacity for self-determination. "It is improper for a police officer to obtain a confession through an express or implied promise of lenience," but "such a promise will not render the confession involuntary unless it overcomes the defendant's free will and impairs his capacity for self determination." Smith v. Bowersox, 311 F.3d 915, 922 (8th Cir. 2002).

In United States v. Brave Heart, the Eighth Circuit considered whether an officer's false promise not to arrest a suspect rendered the confession involuntary. 397 F.3d 1035 (8th Cir. 2005). Defendant Randall Brave Heart ("Brave Heart") was being investigated in connection with the death of his infant nephew. Id. at 1036. The infant died from blunt force head trauma sustained while in the presence of Brave Heart and Brave Heart's one year old son. Law enforcement wanted to interview Brave Heart, because his explanation for the injuries was inconsistent with the cause of death. Brave Heart claimed that his nephew's cause of death was due to a strike to his head with a toy by Brave Heart's one-year-old son. Id. at 1036. Law enforcement

called the Brave Heart residence and requested that he meet them at the police station.  A meeting was set between Brave Heart, FBI Special Agent C. Andrew de la Rocha ("SA de la Rocha") and Cheyenne River Tribal Officer Larry LeBeau ("Officer LeBeau").  Id.

The meeting occurred in a conference room, approximately thirty feet by forty feet, with two adjacent tables in the middle and two doors, each leading to interior hallways.  Id. at 1037.  Brave Heart sat at the head of one of the tables, with SA de la Rocha and Officer LeBeau seated a few feet away on either side of the table.  Id.  Doors were closed during questioning.  SA de la Rocha introduced himself to Brave Heart and advised that he was not under arrest.  Id.  De la Rocha further asserted that he did not intend to arrest Brave Heart, and that the interview was voluntary.  Brave Heart could leave through either door if he wished.  Id.  Brave Heart remained in the conference room, and recited a version of the events, which were consistent with the version that he had provided to law enforcement.  Id.

After taking a break, in which Brave Heart remained in the room and SA de la Rocha and Officer LeBeau had briefly left the room, SA de la Rocha re-entered the room, adopting a more accusatory tone.  Id.  He told Brave Heart that the evidence in the case clearly showed that he was directly responsible for the injuries suffered by his nephew, and that he was responsible for the death.  Id.  SA de la Rocha advised Brave Heart that he had spoken with a forensic pathologist, who had discovered two trauma areas on his nephew's head – instead of the one that Brave Heart had initially claimed.  SA de la Rocha

11

suggested that Brave Heart had been under a considerable amount of stress caring for three children, and that it would be unfair to place the burden of responsibility on his own son for his nephew's death. Id.

Upon becoming visibly upset, Brave Heart confessed to SA de la Rocha, admitting that he struck his nephew's head against a window frame and head butted his nephew, accounting for the two trauma areas. Id. It was undisputed in this case that SA de la Rocha and Officer LeBeau did not inform Brave Heart of his Miranda warnings before or during questioning, nor did they tell Brave Heart he could leave after taping his statement. Id. at 1038. Twenty minutes after the interview ended, officers informed Brave Heart that he was under arrest by tribal authorities, and subsequently placed him under federal arrest. Id.

The Eighth Circuit first determined that that Brave Heart was not in custody. The court then turned to the same issue argued by Mr. Ramos, whether the statement was involuntary because of SA de la Rocha's implied promise that it was not his intention to arrest Brave Heart. The Court stated that "'Even assuming that a reasonable person would view [de la Rocha's] statements as a promise, a promise made by law enforcement 'does not render a confession involuntary per se.'" Id. at 1041 (quoting United States v. LeBrun, 363 F.3d 715, 725 (8th Cir. 2004)). Instead, whether a promise was made is simply one fact to be considered in the totality of the circumstances. The Eighth Circuit further explained, "we note that officers elicit confessions through a variety of tactics, including making false promises, playing on a

suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices. None of these tactics render a confession involuntary, however, unless 'the overall impact of the interrogation caused the defendant's will to be overborne.'" Id. at 1041 (citing United States v. Astello, 241 F.3d 965, 967-68 (8th Cir. 2001); Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993).  See also, United States v. Larrabee, 3:16-CR-30039, 2016 WL 4987122, at ¶3 (D.S.D. Sept. 14, 2016) (surveying cases where government agents breaching promises of leniency did not render confessions involuntary).

In the present case, Mr. Ramos was not physically restrained in any way, and Agent Youngblood treated Mr. Ramos in a calm and cordial manner.  Mr. Ramos' ability to leave was not conditioned on providing any information.  In fact, the situation was quite to the contrary.  Much like Brave Heart's questioning, Mr. Ramos was advised that he was free to leave through the unmarked vehicle's unlocked doors at any time.  He was explicitly told this, and Agent Youngblood confirmed that Mr. Ramos understood this.

Brave Heart's interview took place in a formal conference room at a police station.  Mr. Ramos' interview occurred in an unmarked police vehicle in the parking lot of a Cherry Berry ice cream store, which Mr. Ramos selected.  Brave Heart was arrested twenty minutes after the conclusion of his interview.  Mr. Ramos was arrested more than three months after the conclusion of his interview.

The Eighth Circuit found that Brave Heart's interrogation did not constitute a police dominated atmosphere.  Id.  The circumstances in Mr. Ramos' interview were far less suggestive and overbearing than Brave Heart's. The less evocative methods used in Mr. Ramos' short interview, coupled with the fact that there was a considerable amount of time between the end of the interview and his arrest, as well as the fact that Agent Youngblood did not use a menacing tone or make any threats to Mr. Ramos leads this court to believe that Agent Youngblood's assertion, "I'm not going to arrest you during or after this conversation," did not constitute an express or implied promise sufficient to overbear the defendant's will, nor did it critically impair his capacity for self-determination.

While it is concerning that Mr. Ramos appears to only have a 9th grade education level and has sustained several injuries requiring medical attention for head wounds, this does not outweigh the evidence contained in the audio recording of the interview.  The audio recording establishes that Mr. Ramos was articulate and able to reasonably define "integrity."  A review of his criminal history shows that he has familiarity with the criminal justice system, having being arrested[1] approximately fourteen times.  (Doc. 6).  The audio recording is absent any indication that Mr. Ramos was confused or impaired or that his will was overbore by Agent Youngblood.  Instead, the audio recording and the testimony presented in court establishes that Mr. Ramos was forthcoming and somewhat eager in telling his side of the story that the sexual

---

[1] Two of the medical records indicate that he was evaluated at the emergency room in the presence of law enforcement.  On 7/4/08, Mr. Ramos was discharged to the jail. (Exhibit D).

encounter was voluntary, not by force. The fact that Mr. Ramos was unaware that his admission to the sexual encounter could form the basis of other criminal charges does not render the confession involuntary. The record as a whole demonstrates that Mr. Ramos' confession was voluntary.

## CONCLUSION

It is respectfully recommended that Defendant's Motion to Suppress (Doc. 15) be denied in its entirety, because Mr. Ramos was not in custody while in Agent Youngblood's vehicle at the Cherry Berry parking lot, and his statements were voluntary.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

DATED this 31st day of May, 2017.

BY THE COURT:

_____
DANETA WOLLMANN
United States Magistrate Judge